Margaret H. HINES, Ph.D., Plaintiff,

v.

The OHIO STATE UNIVERSITY, College of Medicine, Defendant.

No. 94CV01088.

United States District Court,
S.D. Ohio,
Eastern Division.

April 1, 1998.

John Spenceley Marshall, Columbus, OH,
for Plaintiff.

Wanda Lees Carter, Moots, Cope & Stanton, Columbus, OH, for Defendant.

## OPINION AND ORDER

MARBLEY, District Judge.

## INTRODUCTION

This matter comes before the Court on Defendant's Motion for Summary Judgment. Plaintiff, Dr. Margaret H. Hines, Ph.D., brings this action against Defendant, The Ohio State University,[1] alleging violations of her rights under Title VII of the Civil Rights Act of 1964 ("Title VII"), 42 U.S.C. § 2000e, *et seq.*, the Civil Rights Act of 1991, 42 U.S.C. § 1981 (" § 1981"), and the Age Discrimination in Employment Act ("ADEA"), 29 U.S.C. § 621, *et seq.* (as amended). For the reasons set forth below, Defendant's Motion for Summary Judgment is **GRANTED** with respect to Plaintiff's gender discrimination claim under § 1981 in Count I of the Complaint,[2] and **DENIED** with respect to Plaintiff's gender discrimination claim under Title VII in Count I, Plaintiff's age discrimination claim under the ADEA in Count II, and her retaliation claim under both Title VII and the ADEA in Count III of the Complaint.

## STATEMENT OF FACTS

Plaintiff, Dr. Margaret Hines, is a seventy-four year old Associate Professor in the College of Medicine at The Ohio State University. A tenured member of the Department of Cell Biology, Neurobiology & Anatomy, Plaintiff has been employed by The Ohio State University since 1962, first as an Assistant Anatomy Instructor. In 1974, Plaintiff obtained a Ph.D. in Student Personnel Administration in the College of Education. She was then promoted to Assistant Professor of Anatomy. Later, in 1981, Plaintiff was promoted to Associate Professor, the position she currently holds.

Plaintiff has sought, and has been refused, promotion to the rank of Full Professor four times: in· academic years 1989–90, 1990–91, 1991–92 and 1995–96. Each of the first three times, Plaintiff was recommended by her Department Promotion and Tenure Committee ("Department Committee"), but rejected at the higher levels in the University. After her third denial. Plaintiff filed a charge with the Equal Employment Opportunity Commission ("EEOC"), alleging age and sex discrimination. Following the issuance of a "right-to-sue" letter by the EEOC, Plaintiff filed this action on November 10, 1994.

Plaintiff was again considered for a promotion during the 1995–96 academic year. Unlike the years past, Plaintiff was not recommended for promotion by the Department Committee; instead, Plaintiff was forced to put her own name forward as a candidate for promotion. Plaintiff again was rejected for this promotion at the higher levels of the University. Plaintiff again filed a charge with the EEOC, alleging retaliation for her pending lawsuit. Later, Plaintiff added the retaliation claims into her Second Amended Complaint. Defendant filed its Motion for Summary Judgment on June 30, 1997.

### The Ohio State University Promotion Process

The Ohio State University utilizes a multi-level review process in making promotion and tenure decisions. The levels of review correspond to the organization of the academic institution, consisting of the Department level, the College level and the University level. An associate professor in Department can become a candidate for promotion in one of two ways: (1) the candidate is selected for consideration by the Department Committee; or (2) the candidate can place himself or herself into consideration.

Regardless of how the process is initiated, a faculty candidate seeking promotion is evaluated at each stage using three criteria: (1)

1. Although Plaintiff's action is styled against the College of Medicine, the University is actually the party in interest.

2. Plaintiff has amended her complaint twice: once to change the caption (May 5, 1995), and another time to add a claim for retaliation under Title VII and the ADEA (February 25, 1997). The Court will use "Complaint" throughout this opinion to refer to the Second Amended Complaint.

teaching; (2) research; and (3) service. These criteria are evaluated in part through review of a candidate's dossier detailing his or her academic credentials and accomplishments. The dossier is first reviewed by the Department Committee, which makes a recommendation to the Department Chairperson. If the candidate passes this review, the Chair's recommendation and the candidate's dossier are then forwarded to the College level, where another committee of faculty members ("College Committee") evaluates the candidate's dossier and credentials, and makes a decision about whether the candidate proceeds to the next stage of review.

Next, upon recommendation by the College Committee, the dossier proceeds first to the University Committee, and then to the Provost. Ultimately, the Provost either recommends for or against the candidate's promotion. A recommendation for promotion proceeds to the University Board of Trustees for final approval and enactment.

Should promotion be denied, however, a candidate may pursue an appeal based upon an allegation of improper evaluation. This process begins informally with a discussion between the candidate and those who recommend against his or her promotion. If such an informal discussion does not result in a resolution of the dispute, then a more formal appeal may be taken before the University's Committee on Academic Freedom and Responsibility.

## ANALYSIS

### Standard for Summary Judgment

Fed. R. Civ. P. 56(c) provides that summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show there is no genuine issue as to any material fact and the moving party is entitled to judgment as a matter of law." The movant has the burden of establishing that there are no genuine issues of material fact, which may be accomplished by demonstrating that the nonmoving party lacks evidence to support an essential element of its case. *Celotex Corp. v. Catrett,* 477 U.S. 317, 322–23, 106 S.Ct. 2548, 91

L.Ed.2d 265 (1986); *Barnhart v. Pickrel, Schaeffer & Ebeling Co., L.P.A.,* 12 F.3d 1382, 1388–89 (6th Cir.1993). The nonmoving party must then present "significant probative evidence" to show that "there is [more than] some metaphysical doubt as to the material facts." *Moore v. Philip Morris Cos., Inc.,* 8 F.3d 335, 339–40 (6th Cir.1993). "[S]ummary judgment will not lie if the dispute is about a material fact that is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the non-moving party." *Anderson v. Liberty Lobby, Inc.,* 477 U.S. 242, 248, 106 S.Ct. 2505, 91 L.Ed.2d 202 (1986); *see also Matsushita Elec. Indus. Co. v. Zenith Radio Corp.,* 475 U.S. 574, 587, 106 S.Ct. 1348, 89 L.Ed.2d 538 (1986) (summary judgment appropriate when the evidence could not lead a trier of fact to find for the non-moving party).

In evaluating such a motion, the evidence must be viewed in the light most favorable to the non-moving party. *Adickes v. S.H. Kress & Co.,* 398 U.S. 144, 157, 90 S.Ct. 1598, 26 L.Ed.2d 142 (1970). The mere existence of a scintilla of evidence in support of the non-moving party's position will be insufficient; there must be evidence on which the jury could reasonably find for the non-moving party. *Anderson,* 477 U.S. at 251, 106 S.Ct. at 2511; *Copeland v. Machulis,* 57 F.3d 476, 479 (6th Cir.1995).

### Gender Discrimination Claim Under Title VII and § 1981 of the Civil Rights Act

The Court first addresses Plaintiff's gender discrimination claim under Title VII and § 1981 of the Civil Rights Act in Count I of the Complaint. In support of her claim, Plaintiff alleges that on three occasions— July of 1991, July of 1992, and October of 1992—males were promoted over her despite the fact that she was more qualified than them. Plaintiff further alleges that women have traditionally been underrepresented in the faculty ranks of her college.

#### § 1981

Plaintiff conceded during oral arguments that claims under § 1981 of the Civil Rights Act are barred by the Eleventh Amendment, as held by the Sixth Circuit in *Freeman v.*

*Michigan, Dept. of State,* 808 F.2d 1174 (6th Cir.1987). As such, Defendant's Motion for Summary Judgment with respect to Plaintiff's claim under § 1981 of the Civil Rights Act in Count I is **GRANTED**.

## TITLE VII

In relevant part, Title VII provides:

 It shall be an unlawful employment practice for an employer—

(1) to fail or refuse to hire or to discharge any individual, or otherwise to discriminate against any individual with respect to his compensation, terms, conditions, or privileges of employment, because of such individual's race, color, religion, sex, or national origin; or

(2) to limit, segregate, or classify his employees or applicants for employment in any way which would deprive or tend to deprive any individual of employment opportunities or otherwise adversely affect his status as an employee, because of such individual's race, color, religion, sex, or natural origin.

42 U.S.C. § 2000e–2(a)(1994). To establish a *prima facie* case of discrimination in a University setting under Title VII in a failure to promote case, Plaintiff must show the following:

a) that she is a member in a protected class (race, gender);

b) that she applied and was qualified for a promotion;

c) despite her qualifications, that she was rejected; and

d) that non-members of the protected class were treated more favorably than plaintiff.

*McDonnell Douglas Corp. v. Green,* 411 U.S. 792, 802 n. 13, 93 S.Ct. 1817, 36 L.Ed.2d 668 (1973); *Mitchell v. Toledo Hospital,* 964 F.2d 577, 582–83 (6th Cir.1992); *Brown v. Tennessee,* 693 F.2d 600, 603 (6th Cir.1982). *See also, Roebuck v. Drexel University,* 852 F.2d 715, 726–27 (3d Cir.1988). The burden then shifts to the defendant, who must articulate a legitimate non-discriminatory reason for the adverse employment action. *Texas Dept. of Community Affairs v. Burdine,* 450 U.S. 248, 253, 101 S.Ct. 1089, 67 L.Ed.2d 207 (1981). The defendant need not show that it was motivated by the proffered reason, only that the non-discriminatory reason, established through admissible evidence, is legally sufficient to justify a judgment for the defendant. *Id.* at 254–55, 101 S.Ct. 1089. If the defendant proffers a sufficient non-discriminatory reason, then the presumption created by the *prima facie* case is rebutted. *Id.* at 255, 101 S.Ct. 1089.

 Next, the burden shifts to the plaintiff, who must establish that the defendant's proffered non-discriminatory reason is merely the pretext for prohibited discrimination. *Id.* at 256, 101 S.Ct. 1089 A plaintiff can prove this in one of three ways: 1) directly by showing that the proffered reason has no basis in fact, i.e., the reason is factually false; or 2) directly by showing that the proffered reason is insufficient to motivate the decision not to promote her; or 3) indirectly by producing evidence that a discriminatory reason more likely motivated the defendant. *Manzer v. Diamond Shamrock Chemicals Co.,* 29 F.3d 1078, 1084 (6th Cir. 1994); *see also McDonnell Douglas,* 411 U.S. at 802–03, 93 S.Ct. 1817; *Burdine,* 450 U.S. at 254–55, 101 S.Ct. 1089. Should plaintiff establish, by any of the three ways, that a genuine issue of material fact exists with respect to the defendant's proffered non-discriminatory reason, then summary judgment is not appropriate and the matter should proceed to trial on the merits.

### Plaintiff's Prima Facie Case

Defendant contends that Plaintiff cannot demonstrate that she was qualified for the position of Full Professor. The crux of Defendant's argument is that Plaintiff had a substandard research record, far below that which would be necessary to become a Full Professor. Although research is but one of the three criteria—research, teaching and service are the criteria—used by the Defendant in determining which candidates will be promoted to Full Professor, Defendant contends that research is the most important

criteria by which a candidate will be judged for promotion.

Defendant refers to affidavit and deposition testimony of various members of the review process to support its contention that Plaintiff did not have a research record which would qualify her for Full Professor. Defendant also cites deposition testimony where Plaintiff admits that research is her weakest area,[3] and that her research record was inferior to that of the faculty members whom Plaintiff alleges benefitted from the adverse employment action of the Defendant, with the exception of one.

Defendant further supports this contention by referring to the testimony of Dr. Martin, a member of Plaintiff's department in the College of Medicine. According to Defendant, Dr. Martin, along with Dr. Ackerman, "represented" Plaintiff before the College Committee, in support of Plaintiff's plea for reconsideration of that Committee's decision not to support Plaintiff's candidacy. Dr. Martin testified that Plaintiff's research record was "below marginal" and "certainly not what would be expected in a basic science department for promotion to full professor." Defendant concedes, however, that Dr. Martin voted in favor of Plaintiff's promotion because he believed that Plaintiff's research record should not be the controlling factor for her promotion; rather, he believed that a candidate need only excel in two of the three categories for promotion.

Dr. Martin's testimony regarding weighing the promotion criteria is the linchpin of Plaintiff's argument that a candidate need only excel in two of the three categories to be promoted. Plaintiff points to three pieces of evidence to support her contention. First, Plaintiff notes that the University has a written rule regarding the criteria for promotion. University Rule 3335–47–02 states:

> In evaluating a candidate's qualifications within [the three] areas, *reasonable flexibility shall be exercised, balancing, where the case requires, heavier commitments and responsibilities in one area against lighter commitments and responsibilities in another.*

(emphasis added). Because Plaintiff claims to have excelled in two of the three areas, she argues that there can be no logical reason, other than gender based discrimination, for the Defendant's refusal to promote her.

Second, and related to the University Rule, Plaintiff cites the testimony of Dr. Sisson, the current Provost of the Ohio State University, regarding the University's valuation of the three criteria. Dr. Sisson testified that teaching and service are not valued any less than research. Plaintiff argues that Dr. Sisson's testimony supports her contention that Defendant was under an obligation to weigh the three criteria equally. She contends that the deviation by the Defendant from the University Rule and custom, requiring equal weighting of all criteria, can be explained only by an intent to discriminate against her.

Finally, Plaintiff asserts that she was designated by Defendant to focus on teaching in order to allow younger male faculty members to focus on research. Plaintiff alleges that Defendant took affirmative steps to prevent her from engaging in research, such as discouraging her application for a research grant from the National Institute for Health and the National Science Foundation, and intentionally assigning her lab space which was inadequate for performing research, despite her requests for adequate space.

■ The Court finds that Plaintiff has established a genuine issue of material fact with respect to her qualifications. Viewed in the light most favorable to Plaintiff, it would be reasonable for a trier of fact to infer, from the testimony of Drs. Martin and Sisson read in conjunction with University Rule 3335–47–02, that Plaintiff was qualified for a promotion, despite her "weak" research record. Furthermore, there is a genuine issue of fact with respect to whether Plaintiff's teaching load, which Plaintiff contends was significant, was made unduly burdensome by Defendant.

■ The Plaintiff has, therefore, met the burden of establishing a *prima facie* case under Title VII in Count I of the Complaint. Plaintiff has adduced sufficient evidence to

---

**3.** It should be noted, in fairness, that Plaintiff qualified this admission by stating that she did not feel that her research record was as substandard as Defendant alleges.

show that she was qualified for the position of Full Professor. Plaintiff establishes a genuine issue of material fact in presenting evidence that the written University Rule and the equal weighting of the three criteria are controlling rather than the heavy weighting of the research criteria, as asserted by the Defendant.

### Defendant's Legitimate Non-Discriminatory Reason

■ As stated earlier, Defendant has asserted that the non-discriminatory reason for denying the position of Full Professor to Plaintiff was that her research record was insufficient to merit the promotion. The Court finds that Defendant's non-discriminatory reason has satisfied its burden of production under *Burdine*, as it is legally sufficient to justify a judgment for Defendant. Defendant cites testimony from various members of the review process to establish that many of her peers thought Plaintiff had a sub-standard research record. If the trier of fact accepted Defendant's rationale as true, such a finding would be sufficient to support a verdict in favor of the Defendant. Thus, Defendant has rebutted the presumption raised by Plaintiff's *prima facie* case.

### Pretext

Plaintiff challenges Defendant's asserted non-discriminatory reason as pretext on all three grounds. Plaintiff first contends that Defendant's asserted non-discriminatory reason has no basis in fact. In support, Plaintiff asserts that her research record is not sub-standard. Plaintiff points to her numerous abstracts which have been published and presented.[4] Plaintiff also points to her numerous collaborative efforts on articles.

Plaintiff further contends that Defendant's proffered non-discriminatory reason is insufficient to motivate the decision to deny her a promotion. As set forth above in the *prima facie* case, Plaintiff contends that her research record should have been irrelevant in the review process because she excelled in both teaching and service. Plaintiff interprets the University Rule to say that she was qualified for the promotion. In addition, Plaintiff points to the testimony of Drs. Schiller and Ackerman, who testified that the research record of Dr. Negulesco was thin on publication and substantive research. Plaintiff and Dr. Negulesco were candidates for Full Professor in 1990. Dr. Negulesco was promoted, while Plaintiff was not. The promotion of Dr. Negulesco, Plaintiff argues, clearly shows that something other than a substandard research record motivated Defendant's decision not to promote Plaintiff.

Finally, Plaintiff adduces evidence that a discriminatory reason was actually at the core of Defendant's decision. Plaintiff cites a report which states that women make up only 9.2% of all Full Professors at the University. She cites no statistics, however, for the College of Medicine or her department. Plaintiff does assert, however, that the disparity in numbers between men and women in the College of Medicine creates a "tough environment for women." Finally, Plaintiff asserts that the College of Medicine's Promotion and Tenure Process is structured to discriminate against women because women carry disproportionate burdens in teaching and service, and are expected to devote significant time to committee activities due to the limited number of women.

■ The Court finds that Plaintiff's evidence of Title VII gender discrimination is sufficient to establish that genuine issues of material fact exist as to whether Defendant's proffered non-discriminatory reason is pretext. Plaintiff has met her burden by producing evidence that Defendant's proffered reason was insufficient to motivate the decision not to promote her, and that a discriminatory motive more likely motivated such a decision. *Manzer*, 29 F.3d at 1084. Viewed in the light most favorable to Plaintiff, the Court finds that a jury could reasonably infer that discrimination, not a substandard research record, motivated the Defendant's decision, given the record and promotion of Dr. Negulesco. Furthermore, in conjunction with the statistics cited, Plaintiff identifies an

---

4. Defendant contends that abstracts do not have a high standing in the scientific community because they are not full reports on research.

Plaintiff, on the other hand, asserts that abstracts are actually prestigious publications on par with other types in academia.

alleged departmental practice—assigning women heavier commitments in teaching and service—as being responsible for statistical disparities in the number of women promoted to Full Professor. *See, e.g., Watson v. Fort Worth Bank & Trust,* 487 U.S. 977, 994, 108 S.Ct. 2777, 101 L.Ed.2d 827 (1988) (when employer uses subjective criteria, plaintiff must identify a specific employment practice which is responsible for statistical disparities).

Plaintiff has established the *prima facie* case, and produced sufficient evidence from which a jury may reasonably reject Defendant's non-discriminatory reason. As the Sixth Circuit has recognized, "there will always be a question for the fact finder once plaintiff establishes a *prima facie* case and raises a genuine issue as to whether the employer's explanation for its action is true." *Manzer,* 29 F.3d at 1083 n. 3 (quoting *Washington v. Garrett,* 10 F.3d 1421, 1433 (9th Cir.1993)). Defendant's Motion for Summary Judgment with respect to Plaintiff's claim under Title VII in Count I is hereby **DENIED.**

### Age Discrimination Claims Under the ADEA

The Court now turns its attention to Plaintiff's claim under the Age Discrimination in Employment Act ("ADEA") as set forth in Count II of the Compliant. Plaintiff alleges that the University's refusal to promote her to Full Professor was predicated on a desire to promote younger faculty members. In support, Plaintiff cites the deposition testimony of Dr. Hayes, a member of the Department Committee, who stated that he was hesitant to recommend Plaintiff repeatedly to the higher committees, fearing that such action "might interfere with the promotion of these other younger people at various levels." Plaintiff also testified that, following a faculty meeting, she overheard another member of the Department Committee, Dr. Beattie, say "Why don't these old people just retire and make room for the new people?"

Defendant argues that Plaintiff's age discrimination claim cannot stand for two reasons. First, Defendant contends that Plaintiff's claim for relief under the ADEA is barred by the Eleventh Amendment.[5] Second, Defendant contends that even if Plaintiff's claim is not barred by the Eleventh Amendment, Plaintiff has failed to adduce sufficient evidence under *the McDonnell Douglas/Burdine* burden shifting analysis to defeat its legitimate non-discriminatory reason for denying Plaintiff the position of Full Professor.

### Sovereign Immunity

The Eleventh Amendment states:

The Judicial power of the United States shall not be construed to extend to any suit in law or equity, commenced or prosecuted against one of the United States by Citizens of another State, or by Citizens or Subjects of any Foreign State.

U.S. Const. amend. XI. This constitutional bar, however, is not absolute. It has long been accepted that Congress may abrogate the states' Eleventh Amendment sovereign immunity. *Atascadero State Hospital v. Scanlon,* 473 U.S. 234, 242, 105 S.Ct. 3142, 87 L.Ed.2d 171 (1985); *Fitzpatrick v. Bitzer,* 427 U.S. 445, 456, 96 S.Ct. 2666, 49 L.Ed.2d 614 (1976). While neither the Supreme Court nor the Sixth Circuit[6] has addressed

5. The ADEA, as originally enacted in 1967, only reached the conduct of private employers. In 1974, the ADEA was amended to reach federal and state government employers. Plaintiff's claim against Defendant, as an instrumentality of the State of Ohio, is brought pursuant to the 1974 amendment. *29 U.S.C. § 630(b)(2).* It is undisputed that Defendant is an instrumentality of the State of Ohio. *See Hall v. Medical College of Ohio at Toledo,* 742 F.2d 299, 301–03 (6th Cir.1984), *cert. denied,* 469 U.S. 1113, 105 S.Ct. 796, 83 L.Ed.2d 789 (1985).

6. At least four district courts in the Sixth Circuit have addressed this issue, with three different rationales leading to two different results. *See Coger v. Board of Regents of the University of Memphis,* No. 89–2374–GA (W.D.Tenn.1997) (J. Gibbons) (unpublished) (ADEA amendments do not abrogate Eleventh Amendment sovereign immunity because Congress failed to express its intention to do so in unmistakably clear language as required under *Seminole Tribe); McCrary v. Ohio Dept. of Human Services,* No. 2:96–CV–896 (S.D.Ohio 1997) (J. Smith) (unpublished) (ADEA amendments do not abrogate Eleventh Amendment sovereign immunity because Congress enacted the amendments pursuant to the Commerce Clause, which is not valid after *Seminole Tribe); Ulmann v. State of Ohio, Bureau of Em-*

the issue, the majority view appears to be that, in the context of ADEA claims, Congress lawfully abrogated the states' immunity under the Eleventh Amendment. *See Hurd v. Pittsburg State University,* 109 F.3d 1540, 1546 (10th Cir.1997); *Davidson v. Board of Governors,* 920 F.2d 441, 443 (7th Cir.1990); *Ramirez v. Puerto Rico Fire Service,* 715 F.2d 694, 699–700 (1st Cir.1983); *EEOC v. Elrod,* 674 F.2d 601 (7th Cir.1982); *Becker v. University of Nebraska at Omaha,* No. 8:96CV80, (D.Neb. January 22, 1998); *Simpson v. Texas Dept. Of Criminal Justice,* 975 F.Supp. 921 (W.D.Tex.1997); *Hodgson v. University of Tex. Med. Branch at Galveston,* 953 F.Supp. 168 (S.D.Tex.1997); *Goshtasby v. University of Illinois–Chicago,* 1997 WL 367362 (N.D.Ill.1997); *Ullman v. The Rector & Visitors of Univ. of Va.,* 1997 WL 134557 (W.D.Va.1997); *Young v. University of Kan. Med. Ctr.,* No. CIV A. 96–2390–KHV, 1997 WL 150051 (D.Kan. Feb.26, 1997).

■ With respect to Defendant's assertion of Eleventh Amendment immunity, this Court is bound by the Supreme Court's decision and analysis in *Seminole Tribe of Florida v. Florida,* 517 U.S. 44, 116 S.Ct. 1114, 134 L.Ed.2d 252 (1996). In *Seminole Tribe,* the Supreme Court held that Congress cannot abrogate Eleventh Amendment immunity via legislation passed pursuant to the Commerce Clause. The *Seminole Tribe* Court set forth a two-prong test to determine whether Congress has abrogated a states' Eleventh Amendment sovereign immunity: whether Congress unequivocally expressed its intent to abrogate the states' Eleventh Amendment sovereign immunity; and whether Congress acted pursuant to a valid exercise of power. *Id.* at 1123, 116 S.Ct. 1114 (citations omitted).

### Intent to Abrogate

■ Based on the plain reading of the ADEA, it is clear that Congress has abrogated Eleventh Amendment Immunity of the states. The 1974 ADEA amendment defines "employer" (the class of potential defendants in age discrimination cases) to include "a state or political subdivision of a state or any agency or instrumentality of a state." 29 U.S.C. § 630(b)(2). *See Gregory v. Ashcroft,* 501 U.S. 452, 467, 111 S.Ct. 2395, 115 L.Ed.2d 410 (1991) ("The ADEA plainly covers all state employees except those excluded by one of the exceptions."). Any "employer" who violates the ADEA is liable for legal and equitable relief under the Act. 29 U.S.C. § 626(b) and (c). When these sections are read together, they evince a clear and unequivocal congressional intent to abrogate states' immunity from liability under the ADEA. *Davidson,* 920 F.2d at 443; *see also Hurd,* 109 F.3d at 1544. In *Davidson,* the Court of Appeals for the Seventh Circuit stated:

> Unless Congress has said in so many words that it was abrogating the states' sovereign immunity in age discrimination cases—and that degree of explicitness is not required ...—it could not have made its desire to override the states' sovereign immunity clearer.

*Davidson,* 920 F.2d at 443 (citations omitted).

■ This Court finds that these statutory sections reflect Congress' intent to abrogate Eleventh Amendment Immunity "in unmistakable language," *Atascadero,* 473 U.S. at 243, 105 S.Ct. 3142, even though Congress does not need to state explicitly or use "magic" words to the effect that it is abrogating the states' Eleventh Amendment immunity in order for this Court to find that such intent was present. *See Fullilove v. Klutznick,* 448 U.S. 448, 476–78, 100 S.Ct. 2758, 65 L.Ed.2d 902 (1980); *Hurd v. Pittsburg State University,* 821 F.Supp. 1410, 1413 (D.Kan.1993), *aff'd,* 29 F.3d 564 (10th Cir.1994), *cert. denied,* 513 U.S. 930, 115 S.Ct. 321, 130 L.Ed.2d 282 (1994) ("*Hurd II*"). This Court is convinced that "the ADEA's express authorization for the maintenance of suits

---

*ployment Services,* No. C2–96–877 (S.D.Ohio 1997) (J. Graham) (unpublished) (ADEA amendments do not abrogate Eleventh Amendment sovereign immunity because Congress enacted the amendments pursuant to the Commerce Clause, which is not valid after *Seminole Tribe*); *Strayer v. The Ohio Veterans' Children's Home,* No. C–3–95–284 (S.D.Ohio 1997) (C.J. Rice) (unpublished) (ADEA amendments abrogate Eleventh Amendment sovereign immunity because the amendments state a clear, unmistakable intent to abrogate and were enacted pursuant to Congress' enforcement power under § 5 of the Fourteenth Amendment).

against state employers comprises adequate evidence to demonstrate the congressional will that Eleventh Amendment immunity be abrogated." *Ramirez,* 715 F.2d at 701.

### Power to Abrogate

The second level inquiry is whether Congress enacted the ADEA amendment pursuant to a valid exercise of power. As a threshold consideration, the Court must examine legislative history to determine whether the ADEA amendment was enacted pursuant to § 5 of the Fourteenth Amendment, as is claimed by the Plaintiff, or whether that amendment was enacted pursuant to the commerce clause, as is claimed by the Defendant. The legislative history of the amendment was explored in great detail in the seminal case of *EEOC v. Elrod,* 674 F.2d 601 (7th Cir.1982), where the Court determined that the amendment was enacted pursuant to Section 5 of the Fourteenth Amendment. This Court, as set forth more fully below, agrees with the *Elrod* Court's reasoning.

The 1974 amendment to the ADEA extended the protection of the act to federal, state and local government employees. As the *Elrod* Court found, "it is clear that the purpose of the legislation was to prohibit arbitrary, discriminatory government conduct that is the very essence of the guarantee of 'equal protection of the laws' of the Fourteenth Amendment." *Id.* at 604. The court noted that the legislative history, though not explicit, indicates a "congressional purpose to prevent arbitrary age discrimination within the protected age group by extending the coverage of the Act to state and local governments. The amendment is aimed at irrational, unjustified employment decisions based upon assumptions about the relationship between age and ability which classify older workers as incapable of effective job performance." *Id.* at 605. After reviewing the complete legislative history of

the 1974 amendment to the ADEA, the court concluded:

> The overall legislative history of the ADEA therefore confirms that Congress' purpose in extending the ADEA to state and local governments was to prohibit discriminatory conduct and ensure equal treatment to older citizens. *The objective of this enactment is clearly 'appropriate legislation' under § 5 of the Fourteenth Amendment.*

*Id.* at 607 (emphasis added).

Further, it is helpful to look at the history of Title VII, which closely parallels the ADEA, to determine whether the Fourteenth Amendment is the basis relied upon by Congress in enacting the amendment to the ADEA. The Supreme Court has instructed, in *Lorillard v. Pons,* 434 U.S. 575, 98 S.Ct. 866, 55 L.Ed.2d 40 (1978), that there are important similarities between Title VII and ADEA, "both in their aims—the elimination of discrimination from the workplace—and in their substantive prohibitions. In fact, the prohibitions of the ADEA were derived *in haec verba* from Title VII." *Id.* at 584, 98 S.Ct. 866. The *Elrod* Court noted that the only difference between the 1974 amendment and the 1972 Title VII amendments is the latter's explicit reference to the Fourteenth Amendment.[7] Both the Seventh Circuit in *Elrod* and the First Circuit in *Ramirez,* however, found this seeming incongruity to be a distinction without a difference. As the *Ramirez* Court noted:

> Nothing in the legislative history suggests that omission represented a conscious congressional relinquishment of its section 5 authority, or that the ADEA's more leisurely parliamentary pavane somehow lost the Fourteenth Amendment beat that had so plainly characterized approval of the comparable Title VII changes.

*Ramirez,* 715 F.2d at 700. Indeed, as the *Ramirez* Court pointed out, the "striking

---

7. The 1974 amendment was passed in conjunction with amendments to the Fair Labor Standards Act ("FLSA"). Both sets of amendments extended the reach of their predecessor acts to the states. Defendant argues that the 1974 amendment has a closer relationship with the FLSA amendments, which the Sixth Circuit has held do not abrogate Eleventh Amendment sover-

eign immunity, than with Title VII. There is no doubt that the 1974 amendment, and even the ADEA itself, is closely related to both Title VII and the FLSA and their amendments. However, the ADEA took its purpose, its *substantive soul,* from Title VII while borrowing *its* remedial scheme from the FLSA, which is a procedural relationship and less persuasive to the Court.

subsequent similarity between the two acts militates strongly in favor of the conclusion that the identical reservoir of congressional power was the well-spring for both." *Id.*; *Elrod*, 674 F.2d at 607.

Finally, the fact that *Elrod* and its progeny antedated *Seminole Tribe* is of no moment, and does not attenuate this Court's ruling. In light of the Supreme Court's ruling in *Seminole Tribe*, the Tenth Circuit Court of Appeals in *Hurd, supra*, reconsidered a prior ruling, *Hurd II, supra*, wherein it had found that the ADEA amendment both intended to abrogate states' immunity under the Eleventh Amendment and was enacted pursuant to § 5 of the Fourteenth Amendment. The court reaffirmed its earlier ruling. The court, through Chief Judge Seymour, concluded:

> In sum, nothing in *Seminole Tribe* requires us to alter our implicit conclusion in *Hurd II* that the legislative history of the 1974 amendment to the ADEA reflects a purpose consistent with the Fourteenth Amendment and that Congress acted pursuant to its powers under the Fourteenth Amendment when it applied the ADEA to the States. Congress intended to and had authority to abrogate the states' Eleventh Amendment immunity from suit by the 1974 amendments to the ADEA.

*Hurd*. 109 F.3d at 1546.

Indeed, this Court's decision is again consonant with the prevailing view. The majority of Courts that have considered this question have found that the 1974 amendment to the ADEA was enacted pursuant to § 5 of the Fourteenth Amendment. *Hurd*, 109 F.3d at 1546; *Davidson*, 920 F.2d at 443;

*Heiar v. Crawford County*, 746 F.2d 1190, 1194 (7th Cir.1984), *cert. denied*, 472 U.S. 1027, 105 S.Ct. 3500, 87 L.Ed.2d 631 (1985); *Ramirez*, 715 F.2d at 700; *Elrod*, 674 F.2d at 609; *Arritt v. Grisell*, 567 F.2d 1267, 1270–71 (4th Cir.1977); *Schloesser v. Kansas Dept. of Health and Envt.*, 766 F.Supp. 984, 990 (D.Kan.1991), *rev'd on other grounds*, 991 F.2d 806 (10th Cir.1993); *Swanson v. Department of Health*, 773 F.Supp. 255, 258 (D.Colo.1991); *Becker v. University of Nebraska at Omaha*, No. 8:96CV80, (D.Neb. January 22, 1998) (unpublished).

Defendant argues that the Supreme Court's holding in *City of Boerne v. P.F. Flores*, —— U.S. ——, 117 S.Ct. 2157, 138 L.Ed.2d 624 (1997) compels this Court to find that the 1974 amendment could not have been enacted pursuant to § 5 of the Fourteenth Amendment. *City of Boerne*, Defendant asserts, stands for the proposition "that Congress' authority to legislate pursuant to [§] 5 of the Fourteenth Amendment is limited to enforcement of existing Constitutional protections as previously defined by the Court." Defendant interprets the holding in *City of Boerne* to mean that Congress may exercise its powers under § 5 of the Fourteenth Amendment only when such legislation involves suspect classes, of which age is not one. *See Massachusetts Board of Retirement v. Murgia*, 427 U.S. 307, 96 S.Ct. 2562, 49 L.Ed.2d 520 (1976) (holding that age is not a suspect class).

This Court does not interpret *City of Boerne* to hold that legislation passed pursuant to § 5 of the Fourteenth Amendment is valid only if such legislation involves suspect classes.[8]

---

**8.** During oral argument, Defendant indicated that the holdings of *Elrod* and *Davidson* might be in jeopardy following the Seventh Circuits' decision in *Goshtasby v. Board of Trustees of the University of Illinois*, 123 F.3d 427 (7th Cir. 1997). In that case, the plaintiff requested dismissal of the defendant's interlocutory appeal, and the court held that the defendant's appeal was not frivolous in light of *City of Boerne*. However, Defendant misses two important points with respect to *Goshtasby*.

First, the Seventh Circuit found that the central questions raised by *City of Boerne*—whether the legislation is preventative and remedial in nature, and whether the legislation is proportion-

al to the harm prevented/remedied—had not been addressed by its previous decisions. As such, the Seventh Circuit's decision in *Goshtasby* speaks more to the fact that the defendant proffered a non-frivolous basis for appellate review than to the viability of the holdings in *Elrod* and *Davidson* or even the strength of *City of Boerne*. The Court noted as much when it stated "[w]hether the ADEA may be sustained as remedial legislation is a subject for the merits panel to consider; it is enough to say that after *Boerne* the University's appeal cannot be called frivolous ..." *Id.* at 428.

Second, Defendant seems to miss the significance of the fact that the Seventh Circuit de-

In *City of Boerne*, the Supreme Court explored the issue of constitutional limits on Congress' enforcement powers under § 5 of the Fourteenth Amendment. The statute at issue, the Religious Freedom Restoration Act ("RFRA"), 42 U.S.C. § 2000bb, was a congressional response to the Court's decision in *Employment Div., Dept. of Human Resources of Oregon v. Smith*, 494 U.S. 872, 110 S.Ct. 1595, 108 L.Ed.2d 876 (1990). In *Oregon v. Smith*, the Court held that neutral, generally applicable laws may be applied to religious practices even when unsupported by a compelling governmental interest. *City of Boerne*, —— U.S. at ——, 117 S.Ct. at 2161. RFRA prohibited generally applicable laws which "substantially burden" the exercise of religion unless the government could show both a compelling interest and that the law was the least restrictive means of furthering such an interest. *Id.* at 2162. The Court held that such legislation by Congress was tantamount to altering the substance of the Free Exercise Clause. Such action, said the Court, could not be considered enforcement, as authorized by § 5, because the legislation was not remedial or preventative in nature, nor was there evidence that the stringent requirements of RFRA were proportional to the harm sought to be remedied. *Id.* at 2168–71.

*City of Boerne* provides further support for this Court's finding that the ADEA amendment was enacted pursuant to § 5 of the Fourteenth Amendment. It would strain this Court's credulity to conclude that the ADEA amendment is not preventative or remedial in nature. The primary goal and purpose of the amendment is to prevent and remedy invidious discrimination against older workers. Furthermore, with respect to the

amendment itself, Congress has done its homework by performing significant fact-finding on the issue of age discrimination, and enacting legislation *prohibiting* states from engaging in such arbitrary invidious discrimination. As the Sixth Circuit has stated with respect to determining congressional intent to legislate pursuant to § 5 of the Fourteenth Amendment:

> [There are] two kinds of cases: those where 'statutes ... simply prohibited certain kinds of state conduct' and those ... where the 'case for inferring intent is at its weakest where ... the rights asserted impose affirmative obligations on the States to fund certain services, since we may assume that Congress will not implicitly attempt to impose massive financial objections on the States.'

*Timmer v. Michigan Dept. of Commerce*, 104 F.3d 833, 840–41 (citing *Pennhurst State School and Hospital v. Halderman*, 451 U.S. 1, 101 S.Ct. 1531, 67 L.Ed.2d 694 (1981)). Clearly, the 1974 amendment falls on the end of the spectrum defined by the first class of cases in *Timmer*.[9]

This Court, therefore, concludes that the 1974 ADEA amendment abrogates the states' Eleventh Amendment sovereign immunity and was enacted pursuant to § 5 of the Fourteenth Amendment.

### Sufficiency of Plaintiff's Evidence

The Court now addresses the question of whether there is a genuine issue of material fact with respect to Plaintiff's claim of age discrimination. The *McDonnell Douglas/Burdine* burden shifting analysis also applies to Plaintiff's ADEA claim. *Mitchell*, 964 F.2d at 582. Thus, in order to

---

clined to follow the reasoning of the dissent in *EEOC v. Wyoming*, 460 U.S. 226, 103 S.Ct. 1054, 75 L.Ed.2d 18 (1983) when it had a chance to do so in *Davidson*. *Id.*

9. Defendant contends that both *Timmer* and *Wilson–Jones v. Caviness*, 99 F.3d 203 (6th Cir. 1996), *opinion amended and reh'g denied*, 107 F.3d 358 (6th Cir.1997), demonstrate that only classes subject to heightened scrutiny can be the beneficiaries of enforcement legislation pursuant to § 5. Defendant seems to conclude that *Timmer* and *Murgia* preclude the result reached by this Court in this matter.

Such a conclusion is faulty for two important reasons. First, the Defendant's interpretation of *Timmer* and *Caviness* would clearly eviscerate the unambiguous text of the Fourteenth Amendment:

> No state shall make or enforce any law which shall ... deny *to any person* equal protection of the laws.

U.S. Const. amend. XIV (emphasis added). Second, and equally important. *Murgia* did not hold that age was not entitled to *any* protection under the Fourteenth Amendment, but rather that age did not qualify for *heightened* scrutiny or protection under it.

establish a *prima facie* case, Plaintiff must show the following:

 a) membership in the protected class (between the ages of 40 and 70);

 b) that she applied and was qualified for a promotion;

 c) despite her qualifications, she was rejected for promotion; and

 d) that similarly situated younger professors were treated more favorably than her.[10]

*Id.* at 582–83; *Carpenter v. Western Credit Union*, 62 F.3d 143, 144 (6th Cir.1995).

### Plaintiff's Qualifications

■ Defendant first argues that Plaintiff cannot meet the second prong of the test because she was not qualified for the promotion. As set forth above in Section I, however, Plaintiff has raised genuine issues of material fact with respect to this element of the *prima facie* case. Plaintiff has adduced sufficient evidence, in the form of the University Rule and related deposition testimony, which contradicts Defendant's assertion that research is the most heavily weighted category of the qualifying criteria. Furthermore, with respect to Dr. Negulesco's promotion, Plaintiff has adduced sufficient evidence that younger professors with research records similar to hers were promoted, and therefore, qualified. The Court finds, therefore, that Plaintiff has met the second element of the *prima facie* case with respect to the age discrimination in Count II for the purposes of this summary judgment motion.

### More Favorable Treatment

■ Defendant next argues that Plaintiff cannot meet the fourth prong of the *prima facie* case of her age claim as it relates to only the 1996 rejection of her application for promotion because no one else was promoted in 1996 in her department, and thus, no one else was treated more favorably. However, the *McDonnell Douglas* method of proving a *prima facie* case "was never intended to be rigid, mechanized or ritualistic."

*Furnco Const. Corp. v. Waters*, 438 U.S. 567, 577, 98 S.Ct. 2943, 57 L.Ed.2d 957 (1978). Because of the uniqueness of the promotion decision in a University setting, in that an unsuccessful candidate is not necessarily replaced by a successful one, the fourth prong of the *prima facie* case can be satisfied by showing that others were granted promotion in the department during a period reasonably near to the time plaintiff was denied promotion. *See e.g., Roebuck*, 852 F.2d at 726; *Brown*, 693 F.2d at 603. Plaintiff has alleged that at least four younger professors in her department were treated more favorably by being promoted to Full Professor in 1991 and 1992. The Court finds Plaintiff's evidence of the four similarly situated professors being promoted in 1991 and 1992 is sufficiently near in time to her many rejections to satisfy the fourth prong of the *prima facie* case.

### Defendant's Legitimate Non–Discriminatory Reason

■ The burden now falls upon the Defendant to assert a legitimate non-discriminatory reason for the adverse employment action. Defendant asserts that the research record of Plaintiff was insufficient to merit the position of Full Professor. As was resolved in Section I, Defendant's non-discriminatory reason meets the standard of the *McDonnell Douglas/Burdine* test, and the burden now shifts back to Plaintiff to show that the proffered non-discriminatory reason is merely the pretext for the prohibited discrimination.

### Pretext

■ Plaintiff argues that Defendant's non-discriminatory reason was insufficient to motivate the decision of Defendant, and that age discrimination was a more likely reason. As stated earlier, Plaintiff argues that a substandard research record could not have motivated Defendant to deny her a promotion given the promotion of Dr. Negulesco, who is also younger than Plaintiff. Furthermore, Plaintiff points to the remarks made by Drs.

---

**10.** Unlike Title VII claims, it is not necessary that the similarly situated person be someone not of the protected class; they need only be younger.

*O'Connor v. Consolidated Coin Caterers Corp.,* 517 U.S. 308, 116 S.Ct. 1307, 134 L.Ed.2d 433 (1996).

Hayes and Beattie, both members of the Department Committee, regarding a desire to create opportunities for younger faculty members.

Defendant argues that the statements in the record cited by Plaintiff do not support the claim that members of the Department Committee used Plaintiff's research record as a shield for their prejudice against Plaintiff on the basis of her age. The statements, Defendant maintains, are insufficient evidence from which a jury could infer discriminatory intent. Defendant contends that Dr. Hayes comment regarding "younger people" was cited out of context by Plaintiff. Defendant also contends that Dr. Hayes was merely concerned that the Department Committee's credibility was suffering by repeatedly submitting and recommending a candidate for promotion who had been rejected time and again. Finally, Defendant argues that the remark by the committee member asking "why don't these old people just retire ..." is subject to different interpretation which challenges the credibility of Plaintiff's interpretation of the remark.

Herein lies the problem with Defendant's arguments regarding Plaintiff's proffered direct evidence of pretext: the Defendant's arguments merely go to the weight and credibility of the evidence, and not the sufficiency of such. Since the Court is bound to review the facts in the light most favorable to the non-moving party, *Adickes,* 398 U.S. at 157, 90 S.Ct. 1598, the Court is not in a position to determine the weight of the proffered evidence, but only the sufficiency of such evidence. *Anderson,* 477 U.S. at 248, 106 S.Ct. 2505; *Kraus v. Sobel Corrugated Containers, Inc.,* 915 F.2d 227, 230–31 (6th Cir.1990).

Thus, the Court finds that Plaintiff has satisfied her burden of showing that a genuine issue of material fact exists with respect to the University's proffered non-discriminatory reason for denying her a promotion to Full Professor. It would be a reasonable inference for a jury to determine that certain members of the Department Committee harbored certain prejudices against Plaintiff based on her age, and that such prejudices played a role in the Department Committee's decision not to recommend Plaintiff for a promotion.

For the foregoing reasons, Defendant's Motion for Summary Judgment on Count II is **DENIED.**

## Retaliation Claims Under Title VII and the ADEA

 Finally, the Court addresses Plaintiff's retaliation claims under Title VII and the ADEA. Again, the *McDonnell Douglas/Burdine* burden shifting analysis applies to claims for retaliatory conduct under Title VII and the ADEA. *Wrenn v. Gould,* 808 F.2d 493, 500 (6th Cir.1987); *West v. Fred Wright Construction Co.,* 756 F.2d 31 (6th Cir.1985). To establish a *prima facie* case of retaliation under Title VII or the ADEA, a Plaintiff must show the following:

1) engaged in a protected activity;

2) exercise of Plaintiff's rights was known by the Defendant;

3) defendant took an employment action adverse to Plaintiff; and

4) there was a causal connection or nexus between the protected activity and the adverse employment action.

*EEOC v. Avery Dennison Corp.,* 104 F.3d 858, 860 (6th Cir.1997). To establish the "causal connection or nexus" for the *prima facie* case, a plaintiff must proffer sufficient evidence to raise the inference that the protected activity was the likely reason for the adverse action; i.e., that the protected activity and the adverse action are not wholly unrelated. *Id.* at 861.

 For retaliatory claims under Title VII and the ADEA, if the defendant asserts a sufficient legitimate non-discriminatory reason for the adverse action, a plaintiff must demonstrate that a genuine issue of material fact exists with respect to whether plaintiff's participation in the protected activity was a "but for" cause of the adverse action; i.e., that plaintiff's participation in the protected activity played a role in the employer's decision. *McDonald v. Santa Fe Trail Transportation Co.,* 427 U.S. 273, 282 n. 10, 96 S.Ct. 2574, 49 L.Ed.2d 493 (1976). For university hiring and promotion processes, a plaintiff need not prove intentional discrimination at every stage of the process. "Impermissible bias at *any* point may be

sufficient to sustain liability." *Lam v. University of Hawaii,* 40 F.3d 1551, 1561 (9th Cir.1994); *Fields v. Clark University,* 817 F.2d 931, 933–35 (1st Cir.1987).

It is undisputed that Plaintiff was engaged in a protected activity: litigation. It is also undisputed that Defendant knew of Plaintiff's pending litigation, and that there was an adverse employment action—the decision of Defendant not to promote Plaintiff to Full Professor. Defendant disputes whether Plaintiff has demonstrated a sufficient "causal connection or nexus," between her litigation and the decision of Defendant to establish the *prima facie* case or, in the alternative, rebut the legitimate non-discriminatory reason proffered by Defendant.

Plaintiff alleges in her Complaint that she was the victim of an adverse employment action in 1995–96 as a consequence of filing this lawsuit. Plaintiff notes that after she filed this lawsuit, and after some of the department and Department Committee members had been deposed,[11] the Department Committee decided for the *first time* not to recommend Plaintiff for promotion to Full Professor, despite the fact that Plaintiff's research record was significantly better than it had been during previous reviews when the Department Committee had recommended her.

Defendant counters that Plaintiff has failed to establish a *prima facie* case of retaliation. Defendant argues that Plaintiff has adduced evidence which is more fairly characterized as mere "suspicions" and subjective beliefs regarding the Department Committee's decision not to promote her during the 1995–96 review process. Defendant further argues that even if Plaintiff has established the *prima facie* case, she has failed to come forward with any evidence which demonstrates a causal relationship between her lawsuit and the Department Committee's decision not to recommend her for a promotion.

The Court finds that Plaintiff has adduced sufficient evidence not only to establish a *prima facie* case of retaliation, but also to establish that a genuine issue of material fact exists with respect to the causal relationship between the Plaintiff's lawsuit and the Department Committee's adverse decision during the 1995–96 review process. The Department Committee had recommended Plaintiff for promotion consistently dating back to 1989. In fact, Dr. Hayes, chairman of the Department Committee during the 1995–96 review, testified at his deposition that he supported Plaintiff for a promotion during the 1991–92 review because he thought Plaintiff's scholarly activity was increasing, but voted against her promotion in 1995–96 despite her stronger scholarship record. And, it is an undisputed fact that the only time the Department Committee did not recommend Plaintiff for a promotion was following the initiation of her lawsuit. A jury could reasonably infer that the Department Committee's decision not to recommend Plaintiff for the promotion could have been motivated by the pending lawsuit.[12]

Furthermore, the Court notes that Plaintiff is not required to demonstrate that either the College Committee, University Committee or the Provost would have recommended her to the Board of Trustees for a promotion if she had received a favorable recommendation from the Department Committee. Where a departmental recommendation is important in the promotion process, evidence of bias within the department is sufficient to sustain liability for prohibited discrimination, even absent evidence of improper bias on the part of the ultimate deciding authority. *Lam,* 40 F.3d at 1561 (citing *Fields*).

Based on the foregoing, Defendant's Motion for Summary Judgment with respect to Plaintiff's claim of retaliation under Title VII and the ADEA is hereby **DENIED.**

**IT IS SO ORDERED.**

---

11. While Defendant disputes that any depositions of committee members actually took place prior to the 1995–96 review process, the Court is obligated to view the facts in the light most favorable to Plaintiff in this matter.

12. There is also testimony of another committee member, Dr. King, that Dr. Hayes expressed concern during the 1995–96 review about considering Plaintiff for a promotion during her pending lawsuit.